Thank you, Your Honor. Stephen Block, co-lead counsel for the plaintiffs in this matter. It is important for this court to understand, I think, the Closer to Zero program promulgated by the FDA to understand how the district court erred below in applying the Ellis factors because it pervaded the district court's opinion in its entirety. First, the Closer to Zero is not intended, and this is not in dispute, to address labeling or warnings to consumers about the presence or risk of heavy metals in baby foods. And secondly, the Closer to Zero prospective action levels that it may issue at some point going forward are nonbinding on the FDA and the public. They're not legally enforceable. They're only intended to provide guidance and recommendations to the manufacturers to lower the levels that are achievable through good manufacturing practices and sourcing processes. They're not intended to set the lowest levels that are achievable for the industry. So the FDA's prospective action levels through Closer to Zero will not provide the expertise to materially assist the district court in adjudicating the claims, which is a standard under Tassie and Palmer and which I note was also recognized under the Ninth Circuit standard by the court in Plum. In addition here, Closer to Zero has been substantially – has been – Can I just pause you before you move to the next point, that there'll be some – will there be, in your view, some determination of what constitutes safe levels? Well, I think the issue here is that the FDA is focused and through the Closer to Zero program is focused on lowering the levels of heavy metal toxins because of the adverse health effects that are not in dispute from – So that sounds like a yes. Well, there will be some connotation and some determination in a global sense that safety – what is safe for consumption will be addressed in some way. Well, but I have another question which is more addressed to the other subject. Let's say that at the end of this thing, whenever it comes, which might be five years or two years or whatever, they come up and say something is safe. Don't I as a customer have a right to know how much they have done? Because I might want to make my decision that something is safer than what is safe. That is, don't they have a duty to tell me how much heavy metal they have even if the amount of heavy metal has been determined by the agency to be safe? Well, there are two responses to that. One, going back to what I said, the purpose of Closer to Zero is to guide the industry in lowering the levels of heavy metals because of the adverse health effects. So there isn't going to be a standard promulgated across the industry for all the companies as to what is safe or not. It's not making a determination. In fact, it's expressly stated, and BeachNut admits this or discusses this in its briefing as well, that the Closer to Zero program is not intended to direct consumers' choices about baby food products. The other really crucial distinction or factor here is that the FDA's Closer to Zero program is not going to be addressing specifically what BeachNut put into the stream of commerce here. This has to do with guiding the industry in lowering the levels as close to zero as possible and what is achievable through a balancing act. But BeachNut, through its sale of rice cereal, as we've discussed in our briefing, already violated the standards, and by exiting the market, conceded that the products that it sold, at least as far as the— Well, we don't know that. That would be a different suit about whether— I mean, you know, what would happen in a suit of the merits as to whether they told you enough or whether they didn't and so on. That's all something to be argued, but it is not what the issue here, what the district court went on. The district court went on something else. Well, just to kind of close out the point, Your Honor, this is a—the FDA and the industry has been addressing this, albeit slowly, if at all, and it's an iterative process. Again, it's not to set necessarily benchmarks on, quote, unquote, safety. It is to address lowering the levels to ward off the adverse health effects from chronic exposure and the bioaccumulation in baby food products that are visited upon infants and young children and which parents are unwittingly purchasing because they are not in a position to understand, you know, what the products contain as far as the risks or the actual elevated levels of heavy metal toxins. So just to stop you right on that word, elevated, what would that mean other than— Elevated above what, I guess, is my question. Elevated above what? Well, certainly in the case of inorganic arsenic in rice cereal, we've already established— I should say it's already been established and conceded by BeechNut through its exiting the market that it sold products, in particular rice cereal products, that exceeded the FDA standards. And the level—that's the only final action level that was set in 2020. So elevated means above FDA set standards? Right, but then there's also all of the analogous standards by the EPA and the USDA that the FDA has looked to for certain guidance. And then there's the draft guidance in the FDA's draft—or I should say in the lead in baby food levels, which is set at 10 parts per billion and 20 parts per billion, which congressional findings and testing by the state of Alaska, which were confirmed by the FDA at the insistence of BeechNut, confirmed that it exceeded those levels because of its internal lax standards, because of its inadequate testing of only ingredients, not finished products. It was ill-equipped to meet and it stood alone in terms of being one of the outliers in the industry of having standards that are remiss. Just to focus on the claims in the complaint, it's a little hard to parse, but are there claims that the level sort of separated apart from any allegations— any claims around safety or elevated levels or anything like that, but simply that what heavy metals and what the quantity of heavy metals are that are contained in the products must be listed? And if so, can you point where in the complaint that is? I'm sorry. You are—I misunderstood. Are your labeling—do you have a labeling—do you have labeling claims that are— that argue false labeling by the failure to include in the list of ingredients, for example, that there are heavy metals in existence and what those level of heavy metals are? Or are the claims, as I read them, it seems, around things like what are the safe levels and what are elevated levels and the like? Well, the claims involve the fact that they're—right. There are elevated levels that they're not suitable and that the internal standards and inadequate testing misled the purchasing decisions of— Let me put that a different way. Yeah. Supposing that the FDA came out with 10 being safe and the label said not it is safe but there are no or very low levels of whatever heavy metal. Are you claiming that your customers would not buy this or would buy something else or something and that this was mislabeled even if it met the requirements of safety that eventually the FDA might come up with? Well, what is—to kind of circle back to Judge Nathan's question and to your question, Your Honor, what is an elevated level? What is a safe level is going to be a matter for experts in this particular action. And then in terms of your question, Judge, yes, parents would never have purchased the product and that's what we allege in the complaint had they known of the existence or the material risk. So what that's thinking of is that there's tremendous evidence that vaccination is safe and yet there are any number of cases that say people have a right to choose not to vaccinate because they want more and they want to have the information. So I think one of the things you're arguing here is apart from what the FDA might come up with, there is here a mislabeling, a misinformation. Correct, Your Honor. And again, the FDA is not going to set through this closer to zero program. This is guidance for the industry. This is not a be-all, end-all benchmark, which is going to be the final determination to guide parents in those choices. However, parents are entitled to know about the risks of what's in the product of baby food that they're purchasing for their children. That's a classic case of— And does your complaint say that they do not give that information? That was the question that the presiding judge kind of asked. Yes. Okay. And to bring that back around to Judge Nathan's question, yes. There is no disclosure in any way in terms of labeling or promotion or marketing or advertising that the presence of heavy metals are in the baby foods that are purchased by the consumers that we represent. And, of course, had they known— But just then to maybe to tie it back to what I was trying to ask, do you have claims that effectively would say labels must indicate the existence of heavy metals? Or do your claims say they must indicate the existence of elevated heavy levels or unsafe levels of heavy metals and the like? Do you have a claim that points to—that is essentially saying, if heavy metals exist in this baby food, labels must indicate the existence of those heavy metals? I think that's correct, Your Honor, and I would point to an analog— Could you point to the claim? Where in the complaint? If not, maybe when your opposing counsel is up, you can look for it. Right. I will address that on rebuttal, Your Honor. Thank you. And so going back to what I was saying, the Closer to Zero program has been substantially delayed because all the deadlines have been eliminated and are now indefinite. And though the district court was struggling or considering this issue, it chose to follow—rather than Plum—it chose to follow the Gerber and Sprout decisions in applying primary jurisdiction. But what's important to note is the Gerber and Sprout decisions, which came quite some time ago at this point, they were laboring under the assumption that the FDA would stick to its original timeline. And the district court's reliance on those decisions, therefore, is undercut. The delays at this point rendered FDA guidance uncertain and indefinite, which also weighs against primary jurisdiction. And Plum and other courts which have followed Plum have noted that these indefinite delays weigh against the invocation of primary jurisdiction. Do Gerber and Sprout use a different standard for determining the helpfulness of the FDA's opinion in this matter? A somewhat lower standard than what our cases say? In terms of— Whether it's a material aid versus to be helpful, for instance. In terms of the primary jurisdiction doctrine, they all apply in varying degrees. The expert advice has to materially assist the court in its adjudication of the claims before it. Can I ask just a background question about primary jurisdiction? Is it analyzed claim by claim, or is it the complaint as a whole? In other words, is there circumstances in which some claims go forward and others are held or dismissed without prejudice? Well, that's an interesting question, Your Honor. And it's very apt because, as we point out in our briefing, in the Wilson against Walmart case, which we happen to be litigating against defense counsel here down in the Eastern District of Arkansas, the claims based on the purchase of rice cereal and based on the fact that there was a final level from the FDA of 100 parts per billion, and that was violated, at least as alleged by the plaintiffs there, that claim was allowed to go forward and was not deemed subject to primary jurisdiction, although the court did, in all candor, stay the balance of the action under the indeference to the FDA while it completes its Closer to Zero program. Although with updates to the court, which we are mandated to do, we will see whether the court takes action similar to the in-kind natural litigation, which is cited by defendants and which was relied upon, albeit in a somewhat different context, by the court below here, where initially the court deferred to the FDA and put the case on stay while the FDA issued a rule on what all natural statements meant in food labeling. However, given the indefinite delays there, the court ultimately lifted the stay because under the standards of Ellis that the costs and delays have to be taken into account in terms of prejudicing plaintiffs in proceeding with their action. So the same thing might happen in Wilson. But to directly answer your Honor's question, yes, the claims can be split, as we see by the Eastern District of Arkansas' opinion. All right. Taking you well over, Mr. Block, you do have two minutes remaining for rebuttal. Thank you. Thank you. Your Honor. I'm going to raise the podium. Oh, yeah. Thank you, Your Honor. Thank you. And you've reserved two minutes for rebuttal. No. I'm sorry. You don't get any time for rebuttal. Thank you, Your Honor. But I will respond. So may it please the Court, I'm Ashley Parrish on behalf of Peach Net. What I'd like to do, Your Honor, is lots of complications this morning, but the briefing has really simplified the case into two things. I'd like to explain what those two things are. And then, Judge Calabresi, I'd like to address your question, which I think is a complicating factor from the other side that just doesn't apply here. But let me start off with this, is the first three points. First, you can't change the claims that they've pled to now move to a claim about arsenic. That was not pled in the complaint as a claim. In the complaint itself, they pled all heavy metals. So that whole first argument they pivoted to, their reply, would require this Court to rewrite their complaint for them and reiterate to the Court that you can't do that. The second thing, Your Honor, and, Judge Nathan, this goes to really your questions, which is this, if you look through the complaint, it's all about whether this is fit for consumption, whether it's healthy and safety for children, whether the labeling is correct. And all of those things are very difficult decisions. Well, whether the labeling is correct. Now, you know, it may be that at some point the FDA will say that something is safe. But that is not the same thing as talking about whether a labeling is correct. So you, Your Honor, you are absolutely correct, which is why they haven't brought a labeling claim because the FDA has plenary authority over the label. The FDA says what should be on the label. Oh, come on now. The FDA may if it does. But preemption is a mighty powerful thing and torts in state, under state law, survives despite the attempt of the agencies and of the pharmaceutical industry to get rid of it. But that is a different claim, Your Honor. And the reason is, is we've got to remember what we're talking about here. When we talk about foods in those types of claims, we're usually talking about ingredients.  You don't expect them to tell you that the apple has so much water in it and so much other chemicals. That's just not relevant information. And what the FDA has said here is that if we disclose this information about these trace levels. Are you saying that at the end of this, the FDA may say that heavy metals are irrelevant? If they say that, then you're saying the same thing about apple. But if you say instead, we, the FDA, find that heavy metals of a certain amount are safe, that doesn't mean that knowledge with respect to how much heavy metal is there isn't something that a consumer might have a right to ask. Your Honor, I'm going to say two things. I'll tell you what the FDA has already said. And then I'll tell you what they're saying they will say under the Closer to Zero Plan. What they've already said is that telling consumers that these heavy metals are in food is dangerous. It should not be on the label because we want children to have a full diet of all of these types of foods. And giving them the impression that these trace amounts of heavy metals are dangerous is actually going to undermine health and safety. In fact, if you make the baby foods yourself, you're more likely to have higher levels of heavy metals. You're more likely to create – How do we know what the FDA is going to say under this thing? You don't, Your Honor, but you know that they've already said what I just said. And what they've said they're going to do now is they're looking very carefully at what the action levels would be. Now, opposing counsel said those things don't mean anything. But what the action levels do is they set a standard that FDA can then enforce. So what FDA would say, Your Honor, is it might say anything below this level here is not enforceable. When is the FDA going to rule? Well, Your Honor, another key point is the FDA has been working on it. It has already issued a series of draft guidances and interim notices, and it is having stakeholders. Are you arguing that ordinary suits cannot be brought under this remarkable doctrine of first – when the FDA or some other agency starts doing something and tells you someday we'll come out with something? What I will say, Your Honor, is this, is that you know the Paradowski case, which says just the allegation that there's heavy metals in the food is not actionable because everybody knows that. Then the question really goes to Judge Nathan's question. But that's a merits argument. Well, Your Honor, I do think they haven't pled that case because what they're trying to do is they're trying to plead that there's something that's unsafe about the elevated level. And the question is – In other words, there's not a claim here that's seeking, as relief, list what the heavy metals are that exist in this product and what those levels are. That is separate and apart from any claim as to safety or elevated levels. Their claim, as I understand it, Your Honor, is to put it in terms of my apple analogy. I don't want – I can't have too much more water because my doctor said limit that. I went and bought an apple. There was more water in the apple than I thought there should be. We don't know what the level should be because we don't know what FDA has said about that. We don't know all the expertise that hasn't been done. They're trying to rely on one set of studies that have been done that have all these problems in them. But wouldn't that question of how much you need to know about water in apples be a very interesting and important question in a particular case and that that is the case that would be brought and it would be brought even after the FDA ruled about apples and water and that that is the case that should be decided rather than the issue of whether now nothing can be done because the FDA may rule that water in apples is safe. What I would say, Your Honor, is under your existing precedent, the idea of water in apples would be an implausible claim and you couldn't bring it unless you had some objective basis for arguing that, in fact, there was a problem. Now, you've got FDA that's specifically looking at this technical issue right now to try to tease out and figure out what are the appropriate levels balancing the idea that if a court were to go out there and suddenly say your label should say this contrary to what FDA says and suddenly set its own levels of what it thought was safe and effective and so forth, that that would be damaging to public health. And FDA is trying to balance these things by looking at experts and stakeholders. For the court to come in, any court to come in at that point and to try to make a decision based just on what evidence would be presented by the subjective views of what some group of plaintiffs think might have been right for them. Remember, this is not a tort claim, Your Honor. This is not a claim that we bought these foods, we tested the foods, these were elevated levels. This is just a generalized claim that they say, look, we think the levels are elevated, they don't allege what that is. They can't allege what it is. They want to try to piggyback on certain studies and they say, and the courts have rightly said, FDA is looking at this issue right now and we should defer to FDA to let it exercise its expertise before we step in and create a public health emergency by trying to decide something that has been allocated to FDA that is incredibly important to public health. So the problem we have, so the only way they get around that problem is to try to pivot to the arsenic claim. And as I pointed out, the arsenic claim is not pled in their complaint. It's just an allegation, a supporting allegation. And the reason they haven't pled it goes back to the idea of what this claim is. If you were actually injured by elevated levels of arsenic, you could say that I bought some baby food, we tested the baby food, here is why it was elevated. But they don't have those allegations because what they're trying to do is plead it as a class action through this idea of a contract benefit for the bargain, which is just designed to say, well, there were some tests that were done by some other organization against some other lots of baby food that we didn't ingest, there's no allegations they ingested, and therefore we can go forward with this subclaim that we've never properly pleaded. So you can't allow them to move forward with the arsenic claim where there has been some action by FDA. But on all of these other issues where they actually have pled. Isn't this all 12B6? No, it might be, but if we got further, we'd know more about what exactly they were claiming and what they were saying. But in 12B6, you're saying because the FDA is starting to do this, they can't spell out what is a bit fuzzy. I'll agree with you on that. In their complaint. So, Your Honor, what I would say is this, is that if they had a claim today that they were injured, in the sense that this was an actual physical harm to them, they could come forward and say, we tested this particular food, here's what the levels were for this particular food. They're not making that claim. If they wanted to come forward today and say something. How do we know? Because it's not in their complaint, Your Honor. That's not what they've alleged. What do you read a complaint to say in 12B6 when your answer is they haven't said anything, although they say something about we wouldn't have bought it. They say all sorts of things. With respect, Your Honor, they've expressly disavowed that claim. So we know that they are not pleading a tort claim. They are not claiming they've been physically injured. What they're arguing is that they have a subjective view that they would have liked to have known that there was more in their view of this naturally occurring element that appears in all food. And the question is, in order for them to prove that claim, and for a court to be able to prove that claim, the question is you have to be able to ask, well, what is a safe level? Do we actually care about this? Is it more dangerous? What do we do with the labeling? What is an elevated level? But all of those allegations don't appear in their complaint because they just assert it as their own subjective view. I'm sorry to come back to my same question, but I'm trying to understand. It seems to me there would be a claim that could proceed if the claim were, if we'd known there were heavy metals in this food, we wouldn't have purchased it. And therefore, the label should include the listing of all heavy metals and the amount of heavy metals that exist in this food. And I don't see that in the complaint. And I think what you're saying is they're not making that claim because, of course, all foods have some amount, at least some trace amounts of heavy metals. Is that the idea? So, Your Honor, you're right. It's not in their complaint. If it was a labeling claim like that, you'd have a preemption problem because it would be challenging what FDA has said. And so they're not arguing that they have a right to know that there's some heavy metals. All foods have heavy metals. Everybody knows that. I think that's your Paradowski case. But the point is, is you're right. That's not in the complaint. So what claim are they? So they're not making that claim. And that's Paradowski on the merits, not a panel saying we don't have jurisdiction while pet food heavy metal amounts are being sorted out. Right. But they haven't pled that. And the reason they haven't pled that, I think, is because of cases like Paradowski. Right. But they haven't pled we're just entitled because if they did, they'd walk into the idea that FDA has control over what is on the label. So what they're arguing instead is they're arguing that through the marketing advertisement, we should have known that there were elevated levels. If you read their complaint, that's what they're saying. And then the question is, what is an elevated level? And in order for a court to determine that, you would have to exercise all the expertise that FDA is doing right now. Why? Why isn't elevated something that people can decide for themselves? Now, it may be that something is safe, but that's different from elevated. Because, Your Honor, every food, every food that you eat today has— People cannot bring suits asking about how much they are eating. So what they can do, Your Honor, is that you do— Again, any food that you buy, a large portion of it that grows in the ground, will have trace amounts of heavy metals. So you know that's there. Just like they'll have other types of chemicals. We do not have a right—I could not bring a suit today that says, Why not? Why doesn't a person who is buying something have a right to know what is in it? And I go back to this business. I go back to this business that I have a right to know whether I'm ordered to be vaccinated, even though I'm told that I must be vaccinated. Everybody knows it's good. Do I still have a right to say no? Your Honor, the reason why FDA has plenary authority over the labeling is because we know that we can't know everything. So if we were to disclose every chemical that's in every part of food, that would be an entire revolution. That becomes the issue in that suit. But let me ask you something different. Why in any event should this have been dismissed rather than stayed? Well, because, Your Honor, there's an open question as to whether you should dismiss or stay. I know. Yes. When we have no idea. Well, Your Honor, what I would say to that is that the Supreme Court's case, Ryder v. Cooper, 507 U.S. 258, says a district court can do either. And below the district court granted dismissal, there wasn't an argument that said he should have stayed instead. And so that argument hasn't been raised on appeal here either. So we think to the extent that there's a question about staying versus dismissing, that argument has been waived. We'll see from the other side. Thank you. Can I ask you about whether primary jurisdiction generally works with the complaint as a whole or is it proper to analyze sort of claim by claim? I think it's both because in this case I think you should look at the complaint as a whole. But I think if you went claim by claim here, they're all the same, in the sense that all of them go to questions whether you look at it in terms of the fraudulent misrepresentation or otherwise as to some assumption as to what is the safe or what counts as an elevated level. And, you know, this is very different than the vaccine analogy because everybody has to eat food. We're all eating food all the time. There's no way to escape this. So someone has to make a judgment. And what this case really comes down to is does that judgment get made through sort of an odd and clever court case that just sort of says there's something I'd like more information about, or does it when it's been assigned by Congress to a regulatory agency to make these difficult judgments and the agency is in the process of doing that, should the court, as the court has said in its Alice case, wait. Should it stay its hand until it gets the information from the experts? And, you know, so this is not like the vaccine case where it is very different. This has sweeping consequences for public health. And FDA has already said we don't agree with these ideas that the current amounts of heavy metals are dangerous. In fact, we want children to continue to eat the full rainbow of the diet regardless of what it is because otherwise if they don't, they'll be malnutritious and there'll be a higher health issue. What has the FDA actually said that is ruling? Well, you keep saying that they've said we want people. I haven't seen that. So, Your Honor, what they've done is it's a negative implication. One is they have plenary authority over the label. So at any point they could change the label and tell them who must get it. Yeah, but, you know, before an agency does something, do we assume that they haven't done it and said it was safe? No. That's absurd. Your Honor, you don't, but you exercise primary jurisdiction when the agency is considering it. You're giving me the answer. You're saying because there is primary jurisdiction that is so, but I don't know that the fact that the agency hasn't said anything should be read to mean that it's okay. Well, so, Your Honor, you're asking me two questions. The first question is has the agency said things? Yes, in public statements nonstop. Public statements? Do we have them in the record? Yeah, we do have them in the record, and in the site to the closer to zero to both parties, you'll see that they actually say this. Now, what Your Honor is also pointing out is that agencies act through final orders, and they haven't done anything final yet. When they set an action level, that creates an enforceable level. It doesn't mean that the action level can't be exceeded, but what it does mean is that once you exceed that, then FDA can exercise its enforcement authority. What the problem is here is we don't know what those action levels are. If I was to ask you, from reading all the briefs, what is a safe level of food, you would have no ability to discern that from anything that's been said in the complaint or otherwise. All by the FDA. But that's why, Your Honor, in all these circumstances, you – So because the FDA hasn't told us, all suits should stop until the FDA finally comes out, if it comes out with something that is definite enough to guide people. Well, Your Honor, there's two things you're asking there. The first thing is, is there so much delay with what FDA is doing? FDA has been actively engaged in this. Look, is what they're doing sufficiently definite in time, space, decision, and so on, so that we can say it makes sense to wait for a little bit until we know what they have said? Your Honor, if you look at the Closer to Action Plan, which is cited in the briefs, and you pull that up, it's actually a web printout, so there isn't a page, but what essentially turns out to be page three of the web printout. They have their planned action items. They go through lead in juices, lead in foods intended for babies and young children, arsenic in foods intended for babies and young children, and what they've done is they've got columns after that, and they say in the first column, they say we're going to have scientific inquiries and stakeholders. They've done that. May I ask you a different question? Yes, Your Honor. Why haven't you gotten an amicus brief from the FDA? Well, Your Honor, you know, if it really is the FDA on its route to doing this, I would have expected you to get the FDA to write an amicus brief, which tells us what they're doing and why, but that's amazingly missing. Your Honor, I'm sorry, but that just is not how the Department of Justice works with amicus briefs these days. I could go and ask them to write an amicus brief, and they are going to tell me— And they might say yes, and they might say no. Have you asked them to write an amicus brief? I have not personally, no. But, Your Honor, I will tell you this is that one reason they would not write that amicus brief is because they are currently and going right now through the analysis, so all they could tell you— That would be very interesting if they wrote us that they were not doing an amicus brief because they were doing what you're saying. Because, Your Honor, they are doing what I'm saying, and if you go to about closer to zero, the FDA's goal is to reduce dietary exposure to the contaminants while maintaining access to nutritious foods, and then it goes on for five pages talking about exactly what they're doing. And the problem is, with all respect, Your Honor, is that they are urging the courts to get into something that could be a huge disaster for public health on the idea that one plaintiff who says, in my subjective view, not that I've been harmed, not that I personally have suffered anything, not that these are elevated levels, but just that I would have liked to know more information. And then the question is, well, okay, well, what is that information? And the FDA has been assigned primary plenary authority by Congress to decide. That is saying the conclusion. No, Your Honor. With all respect, it's not. Okay. Yeah, I'm sorry. Thank you, Your Court, for the time. We appreciate it. Thank you. Mr. Block, you have two minutes for a vote. Do you have a labeling claim? Just to circle back to Your Honor's question, paragraph 181 says, and I quote, Beech-Nut thus wrongfully and misleadingly labeled, advertised, and sold the Beech-Nut baby foods without any label or warning indicating to consumers that these products contain or have a material risk of containing heavy metals or that these toxins can, over time, accumulate in the baby's body to the point where poisoning, injury, and or disease can occur. Beech-Nut intentionally omitted these facts from its labeling, marketing, and advertising in order to induce and mislead reasonable consumers into purchasing Beech-Nut baby foods. And I would also point to court. So that's an argument that the label fails to warn of the dangers of heavy metals. Am I hearing that right? Or is the claim that you just read that Beech-Nut fails to include the existence of heavy metals within its food? Well, it's both in this case. Well, that's the question. Is it a failure to state or failure to state something that is dangerous? And is that something that at 12B6 is sufficient so that at the next stage you can spell out what you're doing or not? Well, again, Your Honor, it's both. One is they promulgate and promote all of the nutritious and health effects which are purportedly beneficial on the labeling without disclosing the negative and detrimental contents of its packaging. And by speaking, they assume the duty to speak the whole truth. They also promote, for example, that iron is in these products, which is a beneficial heavy metal, not the heavy metals that are toxic. And as far as the failure to warn, that's certainly part of our claim. And I just wanted to address a few of these other points. To my colleague's statement that inorganic arsenic with respect to rice cereal is not in the complaint and is a new claim, at paragraph 154 we speak expressly to the fact that they exited the market after everything occurred with respect to the violation of the FDA levels. With respect to Paragowsky, of course, that's specific to General Business Law 349 in New York, and it states, as the Court has recognized, that it is determined by what's exclusively within the possession or whether the consumer should know. We, of course, are going under nationwide states' laws, which are different. And, of course, at 108 through 113, we talk about the fact that BeachNut expressly said, don't worry, the safety of your children is more important to us than it is to you. We test every single lot. We ensure that we're under FDA standards, in particular for rice cereal. With respect to what the FDA- What is your response to defendant's argument that those are background allegations and not a standalone claim for relief? Well, we've specifically delineated in the complaint, and I don't have the paragraph in front of me, but all of the baby foods and the other products that have been sold by BeachNut that are subject to the action.  So it's not- While the complaint is comprehensive and attempts to address as many robust allegations and provide background as well as substantive claims, it may be that the defendants are claiming that they don't have specific or that they didn't have specific notice about the fact that rice cereal  Basically, under what Wilson did, how would this court separate the rice cereal claim and allow it to proceed separate and apart from the rest if it's not a standalone claim? Well, so what the Wilson court did was stay the rest of the action subject to at least temporary deference to the FDA's primary jurisdiction, allowed all of the claims, meaning breach of warranty, consumer protection acts, unjust enrichment, and the like, to go forward with respect to the purchase by consumers of rice cereal. Did you ask for a stay here? Are we correct that you did not? We did not specifically ask for a stay. Did you not tell me explicitly or not? You did not ask for a stay? No, we did not explicitly ask in our briefing for a stay, although we agree with Your Honor that under Ninth Circuit standards and other standards which are set forth in Supreme Court decisions, the fact that the court dismissed, albeit without prejudice, to be refiled at some later point in time, there's a question as to whether the plaintiffs are prejudiced by a lack of tolling of the statute of limitations, and therefore the better course of valor is to stay the action. With respect to the disciplinary authority that the FDA has over labeling, again, this particular program, which is the only program at issue here and which is the only basis on which primary jurisdiction was invoked, is not addressing labeling standards or the duty to warn at all. And at the end of the day— Well, but that then is the issue. If that is not addressing labeling standards, then we have to look to whether your complaint is addressing labeling standards. And so, Your Honor, I go back to the— And that's what the presiding judge has been pressing several times. Now, you say it does. And I go back, in addition to Paragraph 181 that I read from, we also have paragraphs and point the court respectfully to Paragraphs 119, 178, 201, and 289, which also speak to the labeling aspect of our complaint and our claims. What I was saying before is that the plenary authority with respect to labeling is really just a backdoor preemption argument at the end of the day. Though there is authority within the FDA to regulate labeling, it hasn't been effectuated or invoked here at all. And that certainly doesn't— suggests that we will do something about labeling rather than something else. Not at this point, Your Honor. So that if you have made a complaint about labeling, that is not covered. But that goes back to whether your complaint is or can be read to be about labeling. Okay. Thank you. Can I just make one final point? You can finish up. Yeah, make one final point. So going back to what I was saying, that's really a backdoor preemption argument. And while the FDA certainly has the authority to regulate, that doesn't in any way impact the state's ability to enforce through its tort laws, through its regulations, just like the Consumer Protection Acts that the plaintiffs are invoking here and which they bring claims under. State regulation exists in the face of federal regulation all the time. There are a myriad of examples. There are the state Food Drug Cosmetic Act claims or statutes. There are state emission standards that exceed the EPA standards. There are— So there aren't labeling regulations that require the listing of ingredients? In this space, in this industry, baby food industry, at this time, there are no, that we're aware of, labeling requirements in terms of listing the presence of— No, no, no. I mean including whatever ingredients are in the product. Yes. There are certain overarching standards set by the FDA, but they don't speak to this issue that we're addressing. But if what you're seeking is not related to elevated levels or safety statements and the like, but instead just we want the heavy metals that exist in this food to be listed so that the consumer can make their own evaluation as to whether it's safe or not, why doesn't that fall within ingredients labeling requirements? Well, let me just make sure that I'm clear for the Court. This is not just about the presence of trace heavy metals that exist and are naturally occurring, although it is demonstrated that beech nut adds additives, which also create substantially high levels of heavy metal toxins. But this is about—this is much more than trace levels. This is about elevated levels that cause— No, no. That gives me the answer to the question. That cause adverse health effects on a chronic exposure basis, on a bioaccumulated basis for the infant and small children population that are consuming these baby food products. So it's not about information that the consumer can make their own assessment of what's safe or not safe or what's elevated or not elevated. Like here are the heavy metals that exist and here are what the levels are. It's not that. It's about what you just said. That's what the core of the claim is. Correct. Okay. But if the FDA has not said anything about what should be labeled, does that mean that the FDA has said that it is not necessary to label? That is, it's a negative preemption for the argument that because they haven't said, you cannot ask what they say. And that's a very odd argument. Well, it is, Your Honor. I agree entirely. It's a negative implication argument to get to preemption, which is the precise argument that they make in their briefing, and we certainly take a contrary view to that. And they haven't cited any authority for it just because a federal agency that does have the authority to regulate has chosen not to, that there is some kind of amorphous or broadly sweeping preemption that should be applied in that case. And the only case that they do cite, Guyer, is completely inept and doesn't fit within that paradigm.